IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

FELIPE ALFONSO AVILA,
Plaintiff,

v. Case No.: 3:05cv280/LAC/EMT

JAMES R. McDONOUGH, et al.,
Defendants.
_________________________________/

**REPORT AND RECOMMENDATION**

This case filed pursuant to 42 U.S.C. § 1983 is now before the court upon Defendants' special report and supporting documents (Doc. 70).[1] Plaintiff, proceeding pro se and in forma pauperis, responded to the special report and submitted an affidavit (*see* Doc. 72). Upon review of the parties' submissions, it is the opinion of the undersigned that Defendants' motion for summary judgment should be granted.

I. PROCEDURAL HISTORY

Plaintiff filed a third amended complaint against A. Taylor, Chaplain Services Administrator for the Florida Department of Corrections ("DOC"), and James R. McDonough, Secretary of the DOC (Doc. 50 at 1, 2). Plaintiff alleges that his rights to freely practice his religion under the Free Exercise Clause of the First Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a) (2000), have been violated by Defendants (*id.* at 15). Plaintiff also alleges violations of the Equal Protection clause of the Fourteenth Amendment (*id.*). In essence, Plaintiff alleges that DOC policy prohibits him from utilizing multicolored prayer beads in the observance of his religious beliefs (*see id.* at 8–10). For relief, Plaintiff seeks an order

[1] The special report is construed as a motion for summary judgment. Hereafter, the terms "special report" and "motion for summary judgment" will be used interchangeably.

revising and correcting DOC's "unconstitutional policy on" his religion and directing that Plaintiff be "allowed to have and wear" multicolor bead necklaces "according to his religious needs" (*id.* at 15).

## II. BACKGROUND

At all times relevant to this action, Plaintiff was an inmate housed at Okaloosa Correctional Institution ("OCI"), although he is now housed at a different institution (*id.* at 2; *see also* Doc. 44 (change of address reflecting Plaintiff's transfer to Charlotte Correctional Institution)).

Plaintiff alleges the following facts in support of his claims.[2] He is a bona fide and lifelong adherent of the Santeria religion (Doc. 50 at 7). On November 21, 2004, Plaintiff submitted a request to Chaplain Floyd Bland, OCI chaplain, requesting authorization to receive a set of Orisha beads, which are essential to the practice of Plaintiff's religion (*id.*). On December 30, 2004, Plaintiff was provided with a set of "five (5) Orisha bead necklaces with their respective color combinations: 1) solid white, 2) black and red, 3) white and blue, 4) white and red, 5) amber and yellow" (*id.*). Plaintiff alleges that he also received a personal property receipt from OCI "authorizing [him] to have the Orisha beads" (*id.*). A property receipt signed by an OCI officer indicates that Plaintiff was given five (5) sets of "bead necklaces . . . [a]pproved by chaplin [sic]" (*id.*, Ex. B at 1). Plaintiff alleges that when he requested and received the beads, neither Chaplain Bland nor the "property room personnel (security) addressed to [Plaintiff] any security concerns pertaining [to] the Orisha beads color combinations, instead [Plaintiff] was given the [multicolored] bead necklaces by security . . . " (*id.* at 8). Thereafter, Plaintiff alleges that he practiced his religion "in a peaceful and respectful manner" without interference from correctional personnel (*see id.*).

Approximately two to three weeks after receiving his multicolor bead necklaces, Plaintiff was harassed by certain OCI officers for wearing the beads and questioned about his religion, nationality, and the nature and significance of the beads (*id.* at 8). The harassment continued until

---

[2]The court conveys as facts those allegations in Plaintiff's verified third amended complaint (Doc. 50), those contained in Plaintiff's affidavit, which is attached to Plaintiff's response to Defendants' motion for summary judgment (Doc. 72, Ex. A), and those contained in Defendants' affidavit in support of the summary judgment motion (Doc. 70, Ex. B), all of which comply with the requirements for affidavits specified in Rule 56 — that they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e); *see, e.g.*, Dickinson v. Wainwright, 626 F.2d 1184, 1186 (5th Cir. 1980); Murrell v. Bennett, 615 F.2d 306, 310 n.5 (5th Cir. 1980).

May 9, 2005 (*id.*). On May 9, 2005, Plaintiff was questioned by OCI officers about the beads (*id.*). Cpt. Hogan asked Plaintiff to "pull the Orisha bead necklaces from under his shirt, and as [Plaintiff] complied, Cpt. Hogan asked Chaplain Bland, 'Did you authorize those beads?' . . . Chaplain Bland stated that he never did such thing" (*id.*).[3] Subsequently, Cpt. Hogan informed Plaintiff that he could not have multicolored Orisha bead necklaces and would have to send the unauthorized necklaces home or they would be confiscated (*id.* at 9). Chaplain Bland told Plaintiff that he could keep "the solid white Orisha bead necklace but the other four . . ." he could not keep (*id.*).

On or about May 12, 2005, Plaintiff submitted a request to the Chaplain Bland, asking him why he changed his mind regarding the beads (*id.*). Chaplain Bland responded in a memorandum and advised Plaintiff that multicolored beads are a security concern and are not authorized (*id.*). Plaintiff alleges that Chaplain Bland advised him that he did not "know why multi-colored [sic] beads are not authorized" (*id.*).[4]

In Plaintiff's third amended complaint and the affidavit attached to his response to Defendants' special report, he provides a detailed explanation regarding the significance of the Orisha beads, how they relate to a particular Santerian's personal patron saint or "Orisha," and why it is necessary to possess more than a set of solid white beads (*see id.* at 10–11; *see also* Doc. 72, Ex. A at 2–3). For example, Plaintiff explains that the beads and their color must reflect the practitioner's patron saint (Doc. 72, Ex. A at 2). Further, "if the practitioner wears these beads faithfully the beads ensure the practitioner's closeness to the Orishas, as well as protection for negative forces and events" (*id.*). "Even . . . temporary removal of the beads for some reason other than those recognized by adherents . . . may lead to negative consequences for the practitioner" (*id.* at 2–3). Plaintiff next explains that color combinations "carry great significance in the Santeria religion because different color beads correspond to particular Orishas and particular days of the

---

[3]Plaintiff has not specifically identified which beads he was wearing at the time, but it appears he was wearing a solid white set and a blue and white set (*see* Doc. 38 at 12–13 (Plaintiff's verified second amended complaint)).

[4]A memorandum from Chaplain Bland supports Plaintiff's allegations (*see* Doc. 50. Ex. E at 1). In the memorandum Chaplain Bland also stated that pursuant to DOC policy "[p]articipation and availability of [religious] activities and programs [are] subject to restrictions consistent with the security and good order of the institution" (*id.*). The memorandum further states that "[p]age 39 of the Religion Technical Guide, provides instructions for Devotional Items/Head Gear/Clothing for Santeria (La Regla Lucmi) and says: Prayer Beads: (clear or solid white, black or natural color wood)" (*id.*).

week" (*id.* at 3). "I must wear the blue and white color beads for my Orisha, Yemayá, every day, in addition to my daily Orisha beads" (*id.*). Plaintiff continues and notes that, according to DOC policy, the only beads he is allowed to wear are solid white, clear, solid black, and wooden (Doc. 50 at 10). However, according to Plaintiff, "The only color of beads that is in accordance with the Santeria religion tenet is the solid white, there is no such thing as a clear, solid black or wood color Orisha bead necklace[] in the Santeria religion." (*id.*). White beads represent "Saint Obatalá, any other Orisha bead necklaces requires [sic] and must have its color combinations . . ." (*id.*). Plaintiff complains that the DOC policy "contradicts the Santeria religion tenet and is depriving [him] from wearing his Patron Saint (Yemayá) bead necklace which is white and blue. [Plaintiff] also needs, and must have/wear all the [a]forementioned Orisha bead necklaces with their respective color combinations" (*id.*).[5]

Thus, Plaintiff alleges, the DOC policy "is violating [Plaintiff's] right to [the] free exercise of his religion, and fail[s] to accommodate Plaintiff's religious beliefs" (*id.* at 12). Plaintiff specifically alleges that the policy places a substantial burden on his religious beliefs because he "is not allowed to wear his Patron Saint (Yemayá) Orisha bead necklace which is blue and white" (*id.* at 13–14). In addition, Plaintiff alleges that the DOC policy was enacted "without a substantial reason" (*id.* at 13). Plaintiff acknowledges, however, that in response to his grievances the DOC informed him that the policy of restricting the color of beads is based on DOC security concerns (*see id.* at 12; *id.*, Ex. G-3). Nevertheless, Petitioner states that his possession of multicolored beads "is not a security threat" (*id.*). In response to Defendants' special report, Plaintiff notes the DOC's legitimate security concerns, and in fact "concedes . . . [that] [p]rison security and penological institutional safety goals are indeed a most compelling governmental interest," but Plaintiff opines that "wearing beads under his clothes would address [Defendants'] security concerns" (Doc. 72 at 7). "Wearing of beads in this manner avoids their public display and, hence, the easy identification of gang members, while simultaneously permitting [Plaintiff] to exercise his religion" (*id.*).

[5]For example, in response to Defendants' special report, Plaintiff states that "on Monday . . . he wears blue and white beads, as well as the beads for the Orisha Eleggua whose colors are red and black . . ." (Doc. 72 at 3).

Moreover, Plaintiff alleges that the DOC policy is "discriminatory" because it does not prohibit the possession of multicolored prayer rugs or Korans for Muslims, or color combinations on Bibles or rosaries for Christians (Doc. 50 at 12–13). Specifically, Plaintiff alleges that Defendants do not confiscate the multicolor religious artifacts of other religious faiths but rather "allow the inmates to have them . . ." despite the fact that "it is very well known [] that the Gang known as the Latin Kings use the Bible scriptures (the books of Kings and Solomon) to promote and support their cause and to claim legitimacy" (*id.*) (internal quotations omitted).

In their special report, Defendants have provided the pages of the Religious Technical Guide ("RTG") cited by Chaplain Bland (*see* Doc. 70, Ex. A at 1–2). The RTG establishes the DOC policy and provides that Santerians may possess clear, solid white, solid black, or natural wood color beads (*see* Doc. 70, Ex. A at 1). The RTG also states that Santerians can possess up to two images of saints and a medallion (*see id.*). The RTG further states that Santerian group worship is rarely an option in the correctional setting because the animal sacrifices called for by the Santerian faith are not "in keeping with the security and good order of the institution" (*see id.*).

Defendants have also provided the affidavit of Defendant Taylor (*see id.*, Ex. B). Defendant Taylor has been the Chaplaincy Services Administrator of DOC since July 1999 (*id.*, Ex. B at 1). Part of his duties include preparing and distributing the RTG (*see id.*, Ex. B at 2). Defendant Taylor states that "[t]he RTG is developed with input from [DOC] security experts and is only distributed after review by authorities in the Security and Operations Division of [the DOC]" (*id.*). He further states that the RTG requires that "prayer beads used by inmates in religious observances must be one of the following colors: clear or solid white, black or natural wood color" (*id.*). This includes Catholic inmates who utilize the Rosary beads, Muslim inmates who carry Dhikr beads, Buddhist and Hindu inmates who use Mala beads, and Santerian inmates who use Orisha beads" (*id.*).[6] "The restriction [on bead color] is a security concern, and modification of the restriction would necessarily require input from the security experts of [DOC]" (*id.*). "The color restriction is an attempt to provide a least restrictive accommodation for inmates who utilize beads in their religious

---

[6]Defendant Taylor also explained that Dhikr beads are always made with one black bead different from the other beads due to the requirements of the Muslim faith (*see* Doc. 70, Ex. B at 2 n.1).

observance while addressing the security concerns of [the institution]" (*id.*). Defendant Taylor continued that modifying the bead color restriction would create a departure from the standard imposed on the other religions and would be substantially difficult given the total number of inmates identified with religious groups that utilize beads (*id.*, Ex. B at 2–3). Defendant Taylor's affidavit states that as of February 2007, there were approximately 15,000 inmates using prayer beads (*id.*, Ex. B at 3).

III. DISCUSSION

Defendants have moved for summary judgment on Plaintiff's Free Exercise and Equal Protection claims (*see* Doc. 70 at 2–4). Defendants also state that Plaintiff is not entitled to the prospective relief he has requested because the relief he seeks is not narrowly drawn, it extends further than is necessary to correct the alleged constitutional violation, and it is not the least intrusive means to correct the alleged violation (*see id.* at 4). *See also* 18 U.S.C. § 3626(a)(1) (2006) ("Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs.").

A. Summary Judgment Standard

In order to prevail on their motion for summary judgment, Defendants must show that Plaintiff has no evidence to support his case or present affirmative evidence that Plaintiff will be unable to prove his case at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2553–54, 91 L. Ed. 2d 265 (1986). If Defendants successfully negate an essential element of Plaintiff's case, the burden shifts to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. *Id.* The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Id.*; *accord* Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998 (11th Cir. 1992). Further, Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient.

Celotex Corp., 477 U.S. at 324. Plaintiff must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.*; Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997) ("Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by h[is] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'") (quoting Celotex Corp., 477 U.S. at 324); Hammer v. Slater, 20 F.3d 1137 (11th Cir. 1994).

Evidence presented by Plaintiff in opposition to the motion for summary judgment, and all reasonable factual inferences arising from it, must be viewed in the light most favorable to Plaintiff. Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970); Jones v. Cannon, 174 F.3d 1271, 1282 (11th Cir. 1999). A motion for summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 322.

B. Free Exercise Claims

Plaintiff appears to raise two Free Exercise claims. First, Plaintiff alleges that Defendants violated his First Amendment right to freely exercise his religion (*see*, *e.g.*, Doc. 50 at 12, 15). Second, Plaintiff alleges that Defendants violated his free exercise rights under RLUIPA (*see id.* at 15).

"In the First Amendment context . . . a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804, 41 L. Ed. 2d 495 1974); Lawson v. Singletary, 85 F.3d 502, 509 (11th Cir. 1996). A prisoner's right to exercise his religion is not absolute; it is only required that he be accorded a reasonable opportunity to pursue his religion. Cruz v. Beto, 405 U.S. 319, 322, 92 S. Ct. 1079, 1081, 31 L. Ed. 2d 263 (1972) (per curiam). Thus, while inmates maintain a constitutional right to freely exercise their sincerely held religious beliefs, this right is subject to prison authorities' interests in maintaining safety and order. O'Lone v. Estate of Shabazz, 482 U.S. 342, 345, 107 S. Ct. 2400, 2402, 96 L. Ed. 2d 282 (1987); Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987); Cruz, 405 U.S. at 322, 92

S. Ct. at 1081. The Supreme Court held in Turner that when a prison regulation or policy impinges upon an inmate's constitutional rights, the policy is valid if it is reasonably related to legitimate penological interests. Turner, 482 U.S. at 89–91, 107 S. Ct. at 2261–63; Pope v. Hightower, 101 F.3d 1382, 1384 (11th Cir. 1996). Prison administrators should be given great deference in adopting and executing policies and practices. Pope, 101 F.3d at 1384. Absent substantial evidence in the record indicating that officials exaggerated their response to considerations of order, discipline, and security, courts ordinarily should defer to their judgment. *See* Bell v. Wolfish, 441 U.S. 520, 547, 99 S. Ct. 1861, 1877, 60 L. Ed. 2d 447 (1979); *see also* McCorkle v. Johnson, 881 F.2d 993 (11th Cir. 1989).

In a First Amendment free exercise challenge, prior to considering the reasonableness of a regulation, as set forth in Turner, the court must first determine whether an infringement has occurred, specifically, whether the inmate has been substantially burdened in practicing his religion. Cheffer v. Reno, 55 F.3d 1517, 1522 (11th Cir. 1995). The Supreme Court has held that

> [w]here the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

Employment Div., Dept. of Human Res. of Ore. v. Smith, 494 U.S. 872, 878–82, 110 S. Ct. 1595, 108 L. Ed. 2d 876 (1990). *See also* Lyng v. NW Ind. Cemetery Protective Ass'n, 485 U.S. 439, 450, 108 S. Ct. 1319, 99 L. Ed. 2d 534 (1988) ("[I]ndirect coercion or penalties on the free exercise of religion, not just outright prohibitions, are subject to scrutiny under the First Amendment.") (citations omitted); Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 141, 107 S. Ct. 1046, 94 L. Ed. 2d 190 (1987) (quoting and reaffirming Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981)). In Thomas, the Supreme Court held that a "substantial burden" is one that "puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." Thomas, 450 U.S. at 718. This burden must be more than inconsequential. *See* Employment Div., 494 U.S. at 878–82; Walsh v. La. High School

Athletic Ass'n, 616 F.2d 152, 158 (5th Cir. 1980).[7] Thus, to find a Free Exercise violation in the prison context, a plaintiff must demonstrate that prison officials employed a policy or engaged in conduct not reasonably related to any legitimate penological interest or security measure, which substantially burdens a practice of his religion or prevents him from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and significantly interfere with Plaintiff's practice of his religious beliefs. *Cf.* Thornburgh v. Abbott, 490 U.S. 401, 418, 109 S. Ct. 1874, 1884, 104 L. Ed. 2d 459 (1989) (noting that O'Lone found prison regulations valid in part because the prisoners were permitted to participate in other Muslim religious ceremonies).

Free exercise claims may also be brought under RLUIPA. RLUIPA expressly provides for a private right of action for individuals whose religious exercise is unlawfully burdened while incarcerated in prison. *See* 42 U.S.C. § 2000cc-2. Accordingly, "[a] person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." *Id.* § 2000cc-2(a). RLUIPA provides a standard of review less deferential to prison officials:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest and . . . is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a)(1)–(2); *see also* Cutter v. Wilkinson, 544 U.S. 709, 720 (2005) (upholding the constitutionality of RLUIPA).[8]

Under RLUIPA, as with a free exercise challenge under the First Amendment, the burden is first on Plaintiff to show that the government practice challenged substantially burdens his free

---

[7]In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all former Fifth Circuit decisions rendered before October 1, 1981.

[8]In Cutter, the Supreme Court made it explicitly clear that it does "not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests." 544 U.S. at 722. In addition, Cutter notes in footnote thirteen that "[i]t bears repetition, however, that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Id.* at 725 n.13.

exercise of religion. *See id.* § 2000cc-2(b); *see also* Midrash Sephardi Inc. v. Town of Surfside, 366 F.3d 1214, 1225 (11 Cir. 2004) (Plaintiff bears burden of showing substantial burden on religious practice before invoking protections of RLUIPA); Levitan v. Ashcroft, 281 F.3d 1313, 1320–21 (D.C. Cir. 2002) (same).

RLUIPA does not define "substantial burden"; however, many circuits have adopted the substantial burden standard employed in the First Amendment free exercise area. In Midrash Sephardi, the Eleventh Circuit, in a land use case as opposed to an incarcerated persons case, explained what is meant by "substantial burden":

> a "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

Midrash Sephardi, 366 F.3d at 1227. *See also* Konikov v. Orange County, Fla., 410 F.3d 1317, 1323 (11th Cir. 2005) (utilizing the same standard and citing Midrash Sephardi with approval).[9] The interference must be more than an inconvenience; the burden must be substantial and significantly interfere with a plaintiff's practice of his religious beliefs. *See* Cheffer v. Reno, 55 F.3d 1517, 1522 (11th Cir. 1995); *see also* Adkins, 393 F.3d at 569–70 (explaining that a "'substantial burden' . . .

[9]Other courts have defined substantial burden in the context of prisoner RLUIPA claims. For example, the Fourth Circuit Court of Appeals in Lovelace v. Lee, 472 F.3d 174, 187 (4th Cir. 2006), found that

> the Supreme Court has defined the term in the related context of the Free Exercise Clause. According to the Court, a "substantial burden" is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs," Thomas v. Review Bd. of Ind. Employment Sec. Div., 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981), or one that forces a person to "choose between following the precepts of her religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other hand," Sherbert v. Verner, 374 U.S. 398, 404, 83 S. Ct. 1790, 10 L. Ed. 2d 965 (1963).

Lovelace, 472 F.3d at 187 (citing Midrash Sephardi as a "generally consistent definition" of substantial burden). In Adkins v. Kaspar, 393 F.3d 559, 569–70 (5th Cir. 2004), the Fifth Circuit Court of Appeals reached a similar result: "for purposes of applying the RLUIPA in this circuit, a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." Moreover, other land use cases are also consistent with this definition of substantial burden. *See* San Jose Christian Coll. v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir. 2004) (defining substantial burden as "oppressive" and "a significantly great restriction or onus upon [religious] exercise" such that the restriction renders religious exercise "effectively impracticable"); Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761 (7th Cir. 2003) (finding that a substantial burden is "[a burden] that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable").

pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs."); San Jose Christian Coll., 360 F.3d at 1034 (9th Cir. 2004) (defining substantial burden as "oppressive" and "a significantly great restriction or onus upon [religious] exercise"); Urban Believers, 342 F.3d at 761 (holding that a substantial burden "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable").[10]

Accordingly, under both a First Amendment free exercise and RLUIPA challenge, the burden is first on a plaintiff to establish that his ability to freely exercise his religion has been substantially burdened by defendant. *See, e.g.*, Midrash Sephardi, 366 F.3d at 1225; Cheffer, 55 F.3d at 1522; 42 U.S.C. § 2000cc-2(b).

In the instant case, Plaintiff alleges that the DOC policy established in the RTG prohibits him from wearing multicolored Orisha beads and that this policy violates his right to freely exercise his religion (*see* Doc. 50 at 12). More specifically, Plaintiff alleges that he must wear Orisha beads, and in particular, that he must wear blue and white Orisha beads every day, as those colors represent his particular Patron Saint (*see id.* at 10). Plaintiff further alleges that beads of other colors are necessary because they "correspond to particular Orishas and particular days the week" and must be worn in addition to the beads that represent a practitioner's Patron Saint (*id.* at 11). Thus, according to Plaintiff, "a practitioner of Santeria may wear several strands of beads, in various colors, some worn daily and others worn on different days of the week" (*id.* at 12).

Plaintiff has failed to establish a substantial burden on the free exercise of his religion. Although Plaintiff is not permitted to possess beads in the various color combinations he desires, he admits that is allowed to possess Orisha beads, wear Orisha beads, and utilize Orisha beads in his worship (*see, e.g.*, Doc. 50 at 9 (Plaintiff was permitted to keep his solid white beads)). Moreover, it is undisputed that Plaintiff is permitted to possess four different colors of bead sets: solid white, clear, solid black, and wooden (*see, e.g.*, Doc. 50 at 10). Further, Plaintiff concedes that

[10] In assessing this burden, courts must not judge the significance of the particular belief or practice in question. RLUIPA "bars inquiry into whether [the] belief or practice is 'central' to a prisoner's religion." Cutter, 544 U.S. at 725 n.13; *see* 42 U.S.C. § 2000cc-5(7)(A) (defining "religious exercise" to include "any exercise, whether or not compelled by, or central to, a system of religious belief").

solid white beads represent another Patron Saint and comport with the practice of the Santerian faith (*see id.*). Although these colors are not precisely those sought by Plaintiff, this fails to establish that the DOC's policy imposes "significant pressure which directly coerces" him to conform his behavior to the DOC's requirements in violation of his religious faith. *See* Midrash Sephardi, 366 F.3d at 1227. Indeed, the regulation at issue does not "truly pressure[] [Plaintiff] to significantly modify his religious behavior and significantly violate his religious beliefs" because Plaintiff is permitted to use solid white and other colored Orisha beads to practice his religion while he is incarcerated. *See* Adkins, 393 F.3d at 569–70 (emphasis supplied).

The court also notes that the RTG actually provides more accommodation than Plaintiff demands. For example, the RTG provides that Plaintiff may possess up to two images of saints and a medallion (*see* Doc. 70, Ex. A at 1). Plaintiff's allegations concerning his need to honor a particular Orisha could be accommodated under this policy. In particular, Plaintiff could possess up to two pictures of his patron saint Yemayá (*see id.*). In addition, the RTG provides that Plaintiff may worship his Orisha through meditation, the acknowledgment of an important number, color, food, and dance posture (*see id.*, Ex. A at 2). In short, the policy enacted by Defendants does not substantially burden Plaintiff's exercise of religion because it does not force him to change his religious beliefs, nor does it render him unable to practice his religion while he is incarcerated. Indeed, the DOC regulation allows Plaintiff to engage in many activities consistent with his religious beliefs and cannot reasonably be interpreted as a substantial burden on Plaintiff's practice of his religion or a violation of his beliefs.

Moreover, the Supreme Court has made it clear that the Free Exercise Clause affords prisoners "reasonable opportunities" to exercise their religious beliefs. Cruz v. Beto, 405 U.S. 319, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972) (per curiam). The Court recognized, however, that limits may be placed on the religious rights that must be afforded to inmates:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to extent of the demand.

405 U.S. at 322 n.2. An inmate is not free to do that which he might wish to do, nor may he do allowable things at a time and in a manner he might prefer. Muhammad v. Lynaugh, 966 F.2d 901, 902 (5th Cir. 1992); *see* Cutter, 544 U.S. at 722 (RLUIPA does not elevate accommodation of religious observances over an institution's need to maintain order and safety). In Hill v. Estelle, 537 F.2d 214, 215 (5th Cir. 1976), the Fifth Circuit reiterated the long-standing principle that "lawful incarceration results in the necessary limitation of many privileges and rights of the ordinary citizen." Thus, although Plaintiff would prefer to possess multicolored beads, the prison need not permit such beads, as long as reasonable accommodations are available to allow for his beliefs and religious traditions in the prison environment.

Accordingly, no reasonable dispute of fact exists regarding whether Defendants' policy imposes a substantial burden on Plaintiff's ability to freely exercise his religion. Thus, Defendants are entitled to summary judgment Plaintiff's Free Exercise claims. *See* Celotex Corp., 477 U.S. at 322–23.

C. Equal Protection Claim

Plaintiff alleges that Defendants' policy violates his right to equal protection under the law. In particular, Plaintiff alleges that other inmates are permitted to have multicolored religious artifacts, but Defendants do not permit Plaintiff to possess multicolored Orisha beads (*see* Doc. 50 at 12–13).

"To establish an equal protection claim, a prisoner must demonstrate that (1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest such as race." Jones v. Ray, 279 F.3d 944, 946–947 (11th Cir. 2001). Thus, in order to assert a viable equal protection claim, Plaintiff must first make a threshold showing that he was treated differently from others who were similarly situated to him. *See* Nordlinger v. Hahn, 505 U.S. 1, 112 S. Ct. 2326, 2331, 120 L. Ed. 2d 1 (1992); Hendking v. Smith, 781 F.2d 850 (11th Cir. 1986). Plaintiff must also allege that Defendants acted with the intent to discriminate against him. *See* McClesky v. Kemp, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767, 95 L. Ed. 2d 262 (1987); E&T Realty v. Strickland, 830 F.2d 1107, 1113 (11th Cir. 1987). Conclusory allegations or assertions of personal belief of disparate treatment or

discriminatory intent are insufficient. GJR Inv., Inc. v. County of Escambia, 132 F.3d 1359, 1367–68 (11th Cir. 1998); Coon v. Ga. Pac. Corp., 829 F.2d 1563, 1569 (11th Cir. 1987).

"Equal protection claims can be divided into three broad categories." E&T Realty, 830 F.2d at 1112 n.5. The first category includes claims that a regulation discriminates on its face. *See id.* "In such a case, a plaintiff can [ordinarily] prevail by showing that there is no rational relationship between the [] classification and a legitimate state goal." *Id*. Where the classification involves fundamental rights or certain characteristics such as race, alienage, national origin and gender, however, the classification is subject to a heightened standard of review. *See* Romer v. Evans, 517 U.S. 620, 631, 116 S. Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996); City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440–41 (1985).

The second and third types of equal protection claims involve facially neutral regulations. *See* E&T Realty, 830 F.2d at 1112 n.5. The second category includes claims that "neutral application of a facially neutral [classification] has a disparate impact." *See id*. The third type of claim is that the government is unequally administering a neutral regulation. *See id*. In both cases, a plaintiff must establish that purposeful discrimination or discriminatory intent motivates the disparate impact or disparate treatment. *Id*.

In this case, Plaintiff alleges that the DOC treats Santerians differently from other religious groups (*see* Doc. 50 at 12–13). Initially, Plaintiff alleges that Muslims are permitted to use multicolored prayer rugs and other groups are permitted to possess bibles of different color combinations (*see* Doc. 50 at 13; Doc. 72 at 12–13). These allegations, however, fail to state a claim, as Plaintiff is not similarly situated inmates who use rugs or bibles for worship. Moreover, the DOC policy challenged by Plaintiff, and for which he seeks injunctive relief, specifically concerns the color of prayer beads that may be possessed by inmates.

Regarding the color of prayer beads, Plaintiff alleges that "Catholic rosaries . . . of several color combinations" are permitted (Doc. 50 at 13). Although Plaintiff may be similarly situated to Catholic inmates, as each use a type of prayer beads for worship, the DOC has presented uncontroverted evidence showing that the RTG applies universally to all religious groups (*see* Doc. 70, Ex. A at 1–2; *id.*, Ex. B at 2). Specifically, Defendant Taylor's affidavit states that the RTG requires that "prayer beads used by inmates in religious observances must be one of the following

colors: clear or solid white, black or natural wood color" (*id.*, Ex. B at 2). This includes Catholic inmates who utilize Rosary beads, Muslim inmates who carry Dhikr beads, Buddhist and Hindu inmates who use Mala beads and Santerian inmates who use Orisha beads" (*id.*) (emphasis added).

Thus, Defendants have successfully negated an essential element of Plaintiff's case, shifting the burden to Plaintiff to come forward with evidentiary material demonstrating a genuine issue of fact for trial. Celotex Corp., 477 U.S. at 322–23. Plaintiff's conclusory allegation that Catholic inmates may possess multicolored rosaries is insufficient to meet this burden. Plaintiff has submitted no evidence, such as the affidavit of any other inmate, in support of his conclusory allegation. Furthermore, Plaintiff has not contradicted Defendant Taylor's affidavit, in which Defendant Taylor explained that there are 15,000 members of the four major religious groups that utilize prayer beads — not including Santerians — and that these groups are subject to the same restrictions on bead color (Doc. 70, Ex. B at 2). As noted *supra*, Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., Ltd., 475 U.S. at 586, and a "scintilla" of evidence or a conclusory allegation is insufficient. Celotex Corp., 477 U.S. at 324. Accordingly, Plaintiff has failed to establish that he has been treated differently than other similarly situated inmates with regard to the color of prayer beads he may possess.

Even if Plaintiff could establish disparate treatment of similarly situated inmates, he must further demonstrate that Defendants' actions were taken with the intent to discriminate against him. *See* McClesky, 481 U.S. at 292; Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 265, 97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977); E&T Realty, 830 F.2d at 1113. There must be intentional discrimination: "[m]ere error or mistake in judgment" or "[e]ven arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." *Id.* at 1114. "'Discriminatory purpose' implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected . . . a particular course of action at least in part 'because of' its adverse effects upon an identifiable group." *Id.* (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279, 99 S. Ct. 2282, 2296, 60 L. Ed. 2d 870 (1979) (omission in original)). Conclusory allegations or assertions of personal belief of disparate treatment or discriminatory intent are insufficient. GJR Inv., 132 F.3d at 1367–68 (finding that

allegations that defendants' actions were "arbitrary and capricious in that [they] acted with an improper motive, without reason, or upon a reason that was merely pretextual" were insufficient to state a claim); Coon, 829 F.2d at 1569.

Plaintiff argues in response to Defendants' special report that the uniform regulation on bead color is "tainted by discriminatory motives" (Doc. 72 at 11–12; *see also* Doc. 50 at 12 (Plaintiff alleges in his complaint that the DOC policy imposes a "substantial burden on the Plaintiff's religion in a discriminatory fashion")). Plaintiff, however, has submitted no more than assertions of personal belief and has not come forward with any evidence, much less even a scintilla of evidence, demonstrating that Defendants adopted or implemented the RTG policy with an intent to discriminate against Plaintiff in particular or against adherents of the Santeria religion in general. *See* Celotex Corp., 477 U.S. at 324 (conclusory allegations are insufficient to withstand a motion for summary judgment). Moreover, given that the policy applies to approximately 15,000 non-Santerian inmates, no genuine issue of material fact exists demonstrating that the policy intentionally discriminates against Plaintiff or the adherents of Plaintiff's faith. Thus, Defendants are entitled to summary judgment on Plaintiff's Equal Protection claim.

IV. CONCLUSION

Defendants have established that the RTG regulation does not impose a substantial burden on Plaintiff's free exercise of religion and is not violative of the Equal Protection clause. Therefore, Defendants are entitled to summary judgment on all of Plaintiff's claims.

Accordingly it is respectfully **RECOMMENDED**:

That Defendants' motion for summary judgment (Doc. 70) be **GRANTED**.

At Pensacola, Florida this 25th day of July 2007.

*/s/ Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE TO THE PARTIES**

**Any objections to these proposed findings and recommendations must be filed within ten (10) days after being served a copy thereof. Any different deadline that may appear on the electronic docket is for the court's internal use only. A copy of objections shall be served upon all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**